Okay, the next case is number 17-1045, Precision Standard, Inc. against the United States Defense Logistics Agency. Mr. Cox. Good morning, Judge Newman. May it please the Court. This appeal comes before the Court from the ASPCA, and there were two cases that the ASPCA heard. The first, which is the termination for default. That's the one that we're here on appeal. And the second was for some breach of warranty claims that have since been settled. So we're left with just the termination for default matter. And as we set forth in our brief argument is that the ASPCA got that decision wrong. They should not have granted summary judgment for the government because the termination for default decision was erroneous. Is the termination for default decision by the CO, do I have it correct that the way that's reviewed by the board below is for an abuse of discretion? It would be contrary to law or arbitrary and capricious. Those are the things that they look at. And our position was that since the wrong standard was used to reject our parts, there was absolutely no evidence that it was arbitrary and capricious and violated the contract. And so I think what the board was saying was that as a matter of law, there's no material question of fact. And so granted summary judgment that there was no abuse of discretion in the CO's determination. Correct. And where we respectfully disagree with the board is that the board seemed to be focused on the dispute. Can I just ask a procedural question? Yes. Because I'm not familiar with these proceedings very well. If the board had determined there is a genuine issue of fact here, would it have denied the summary judgment motion and then had a trial? Yes, there would have been an evidentiary hearing or trial as you referred to it. So the way we have to look at it is whether there's a genuine issue of material fact that you raised. That's correct. For you to possibly go forward on a claim that it was the government that materially breached this contract. That's correct. It's not a question of, well, the board made some fact findings and we have to review that under a clearly erroneous standard or something like that. Correct. Okay. Would you comment to get to the merits on the applicability of that FAR provision where the contractor is required, is supposed to continue performance when there's a dispute along the way? Yes, certainly. And that is the crux of the board's decision. They decided in favor of the government on that basis that they said, well, regardless of whether or not the correct standard was used to inspect and reject your parts under the warranty clause, you still under the disputes clause that you referred to, you still had to keep going. You still had to keep performing. You could have filed a claim and asked for money to right your wrong. But our position was that that's contrary to Armed Services Board of Contract Appeals Law as well as Federal Circuit Law. And specifically, I would refer... But the contractor did not continue, is that correct? That's correct. When modification P3 was issued, the contractor, I think within a week, sent a letter to the On the theory, on what theory? On the theory that the manufacturing process that was used was correct or could not produce an unobjectionable product? Or that is, that performance would have been fruitless? Well, their position, we'd have to look at the record. It said Appendix 1018. The letter is not very specific as to why. It just basically objects to the issuance of modification P3. But basically, their position was, look, we produced these parts in Michigan. We inspected them. We certified them to this spec that we did, which was 6858. The DCMA, the local DCMA, tested the parts. And they said, yeah, they're fine. We recommend you pass them first article. They're shipped to Utah, to the Hill Air Force Base. The Hill Air Force Base folks look at them and say, yes, we're going to grant you conditional approval. Where does this letter say that they object to the modification? Is that Appendix 1018, Your Honor? Yeah. It doesn't say that. Yeah, it's not very clear. But that letter was in response to the government's breach of warranty letter that can be found at Appendix 1014. But I think the question was, when did you tell the CO that you didn't agree with the modification or with the standards? And where's that communication? I think you referred us to A1018. But I just, like Judge Chen, I don't see it there. Yeah, there's nothing in the record other than that letter and then the one that followed it, Appendix 1019, where PSI specifically said, we're objecting to modification P3 because... Oh, where did they say that? No, I'm saying there's no record. There's no document in the record that says that. So there's nothing in the summary judgment record? There's nothing in the summary judgment record that specifically says that. However, again, this is, in our mind, a legal question. Because if we look at the Federal Circuit's decision, for instance, an Alliant tech system, they specifically state that it's a material breach for the government. If there's a material breach for the government, it has the effect of freeing the contractor of obligations. But you didn't tell the CO that you thought that there was a material breach, right? Or your client didn't? No, they did not specifically use those words in those letters to say that. Alliant, that opinion, I'm trying to remember, isn't the standard something like, if the government elects to make a cardinal change through a modification to the terms of the contract, then under those kinds of severe changes, then the contractor does have some freedom to elect not to follow such a severe change. But otherwise, the contractor is required to keep on chugging along in light of any modification made that's less than some kind of a cardinal change. Is that? That's correct, Your Honor. Okay. It doesn't talk about a cardinal change being, again, something that is... So then that boils down to whether what we have here was something so severe that it rises to the level of a cardinal change to the terms of the contract. Correct. And our position is obviously, look, it goes to the very heart of the contract. We're making parts, and they're inspected to a certain spec. And that's the one we contractually agreed to. That's the one you approved. You can't come along and change that spec, reject our parts, and then say, well, you're going to have to ship us more. Well, there was a problem with the parts that they received, right? Or at least they reported parts that they received that were so defective that you wouldn't want to install them, right? No. There was some issue of fact. They received these parts at Hill Air Force Base. The government had possession of them for a few weeks or almost a month. They were unpackaged. They were put in a truck. They were driven across the base. So there was some visible damage to some of the spot welds. Now, there's a dispute in the record as to what they saw. On one account, we heard from a government official saying, well, the welds were pulled through. Another person said, well, there were visible cracks. So there was an issue of fact as to what was the problem to begin with that made the government put them under the x-ray machine and look at them that closely. So when they did that, when they looked at the parts under the x-ray machine, that's when they changed the spec. This is contrary to the contract, contrary to what they approved our parts, the spec that our parts were supposed to meet. They employed this new spec, D17.2, which was a higher standard. And not only did they use the wrong spec and one spec that we didn't agree to, but they used the portion of that spec to dealt with test items. These weren't test items. These were production parts. These were 16 of the 70 parts that we had shipped to Hill Air Force Base that had been accepted, half of which we're not sure, but we think were on airplanes. So these were production parts. And the spec that was supposed to be used, if you're going to look at them under an x-ray machine, is 6858. And that's a lower standard than the ones they used to reject our parts. There's something very hard to understand here. Are you saying that the Mod 3, the new spec, was impossible of compliance? You're under Modification Pooh 3. The only thing that did was said, look, we've issued a breach of warranty letter. We want you to ship us two additional parts so we can look at them. And we said, no, we're not going to do that. We're not going to ship you two additional parts under Modification P3. Because the parts that we shipped to you were accepted by the government, they're inspected, they're fine. So that's what P3 did. Well, maybe that's your view, that you delivered them, you didn't hear an objection for a while, and then you deem them to be fine. But now the government was telling you for several months that there were safety problems, there were defects with the initial batch you delivered, and they needed to ensure that these skins would work and be safe for their intended purpose. So I guess, am I right in recalling that what it felt like to me was the contracting officer was trying to get in touch with someone from PSI and was having a hard time of getting PSI to engage with the CEO during this time where there were all these concerns about what PSI was a few months, PSI never said, that modification is a cardinal change to the contract. I'm not going to operate under this severe alteration to the contract. Am I understanding the story correctly? And then ultimately, because you finally said, we're not going to follow these modifications, that's when the CEO felt like, okay, this situation is broken and put, terminated the contract. That's right, Your Honor. It all started with the breach of warranty letter that was issued at Appendix 10 and 14. That's when the contracting officer first notified us that, hey, we've found some problems with some of your production parts, allegedly. That was the first time, October? That was the first time they notified us. That was the breach of warranty letter. And this is, again, after our parts had been, they passed first article, they passed DCMA inspection, Hill Air Force Base looked at them, they said they're fine, and we started producing. We shipped 70 parts, production parts. And then all of a sudden, we get this letter in October saying, hey, we've got some issues. We see some problems with some of these skins. Going back to Judge Chen's question, on, in the board's decision at Appendix page 15, there are a number of places where the board notes that there was a failure to respond to that October 12, 2000 letter by the CEO. And that then the CEO asked again for a response, but then PSI failed to respond again. Ultimately, I think then, you know, is there anything that, where you think there's a genuine issue of fact with respect to the facts, what seems to be the undisputed facts that are listed here on Appendix page 15? I don't dispute that. As I pointed out to the panel, the letter that PSI sent on October 12 at Appendix 1018, that was their letter objecting to this breach of warranty claim and the modification that was issued, directing them to ship them two additional test parts. They did object to it. They didn't specifically state, we think this is a cardinal change and et cetera, et cetera. But that was their letter objecting to it and basically telling the contracting officer that that's it, we're not going to comply with that. Are you telling us that this was an unreasonable position? What is the relief that you're requesting? Well, we think that the determination for default was improper. It should have been converted to determination for default. The case law is clear in the federal circuit. You can't have a material breach for the government, which we're alleging here, that the government changed the warranty spec, rejected our parts without telling us. It wasn't in our contract. They can't hold us to a higher- What do you mean they didn't tell you? I thought they were telling you through the late summer and into the fall, the problems they were having. Your Honor, we entered into a contract with them and incorporated a certain spec that said, look, this is the spec you're going to be governed by. That is the spec we certified to. Right, but you're not saying that there's no ability for them to make modifications to a contract, are you? They certainly could, but they never did. They never added the reference to this new spec that they used to reject our parts. They never added the reference to the drawing until after they had accepted our parts and after all that had occurred. So we never were contractually bound to follow that spec that they used. But for whatever reason, they chose to use it. It was a higher bar. What's the evidence you have in the record that can give us some feeling that the other welding standard is so dramatically different that it amounts to a cardinal change? Well, Your Honor, I would direct your attention to Appendix 855. 855 sets forth the relevant excerpt from the spec that we're objecting to, the D-17-2. And at paragraph 4.7.2, it talks about all Class A test welds. Test welds. This was a production part. Again, this is the wrong standard to be applying. This is a test spec that's applied to maybe a first article. But these are production parts. So not only are they using the wrong spec, but they're applying the test weld section. And here it says all welds should be free of cracks and expulsion. Now that's black and white. There's cracks. We have to reject it under the spec. I think the board kind of didn't rely on this discrepancy in its decision, right? Instead, it said the record reflects the government's imposition of AWS D-17.2 was done in good faith that it was the correct standard. And there's no evidence in the record that PSI raised this issue of breach by the government at the time that Mod 3 was issued. So that was the basis upon which the board reached its decision in granting summary judgment and saying that the CO didn't abuse its discretion, right? That's right, Your Honor. So isn't this kind of a sideshow? Well, it's absolutely not a sideshow because the board, where we disagree, they said, well, under the disputes clause, it doesn't matter if the government makes up a spec and rejects your parts that we've already approved. It doesn't matter. You've got to just keep going. But doesn't there have to be some communication to the CO so there can be a determination as to whether there was an abuse of discretion by the CO in terminating the contract? Well, the issue that we disagree with, we're saying that there's a prior material breach by the government by imposing a spec that we weren't contractually obligated to follow, rejecting our parts, and then issuing a mod telling them you've got to issue new test specimens for them to look, that's a prior material breach. And that excused us of all future performance, including under the disputes clause, which this federal circuit and Alliant Tech System specifically stated. They said that once there's a prior material breach for the government, excuses performance and even the disputes clause, which is what the ASPCA judge hung her head on in terms of granting summary judgment for the government. I was a little confused by your reliance on the board's denial of summary judgment for the government's claim. So the government claimed that your client breached the contract, the warranty provisions, and you say that somehow that precludes summary judgment on this issue where we're looking at whether the CO abused his discretion in terminating. How do those two, I don't see how those two relate when it's the government's breach of warranty claim, not your breach of warranty or your breach of contract argument. It's the government's breach of warranty argument that was denied. And the government's breach of warranty claim, it was based on a rejection of our parts utilizing the spec that I pointed out that we never agreed to. We weren't obligated to follow. So our point is, I guess you got to look backwards. The judge said that the termination was proper because the contract officer looked at it and said the parts didn't meet spec, therefore I'm going to terminate for default. Well, sure they didn't meet the spec. That wasn't the proper spec that they were using. That's the whole argument. That's the disconnect. Well, there's a genuine issue of material fact as to, I guess, whether it was the right standard or whether there was such a difference in the standard that it would be a breach of contract. Yeah. And the judge even pointed out as to the second ASPCA appeal number 58205, she said, well, I can't grant summary judgment on that issue because there's an issue of fact as to whether the government used the right spec or the wrong spec or what spec they were supposed to be using. But yet she went ahead and said, it's okay. What the government did, terminating for default was okay. It doesn't matter whether they used the right spec. I think what she was saying was that the CO did not abuse his discretion or his discretion in there was just no communication at all. That was at least one of the grounds. Well, again, I guess I've been over that. All I can say is they objected to it in writing and they said they weren't going to comply with it. So where does this stand? Was there a re-procurement? Is there still an argument? Or as a result of the board's decision, this was a loss that your client has borne so far? Yes, this is a loss they've borne and we feel like we'd like to have it converted to termination for convenience so we can get paid our costs back. We settled the second appeal, as I said, so that's no longer there. But this one here we feel should be converted to termination for convenience. Okay. Thank you, Mr. Cox. Thank you very much. Mr. Perotta. Good morning. May it please the court. PSI's contract here for A-10 aircraft cowling skins was terminated for default after all 16 of the parts that were on hand at the Hill Air Force Base were inspected and determined to have numerous visible cracks that were apparent on the surface of the parts. Flawed spot welds in these type of parts could result, as the undisputed records show, in pieces of the metal shearing off during use, being sucked into the airplane engines, causing the loss of the aircraft and loss of life. Did they comply with the old welding standard but not comply with the new welding standard? No, Your Honor. In fact, as we cited in our brief and as the Defense Logistics Agency relied upon in the context of the termination for default, we've cited three different specifications that the government contends these parts failed to comply with because of the defective spot welds. PSI and its counsel have argued that one of those provisions that we relied upon, the radiographic testing provision, they've said, well, that applies for test specimens, and these were actually production parts. We don't think their reading of the provision is correct, but it really makes no difference because it's undisputed, as the ASBCA found, that the other standard that we relied upon plainly states on its face it applies for production parts, and the table that's appended to that specification is entitled Visible External Imperfections for Production Parts. These were production parts, and that standard, under all three of the iterations of the specifications, from the one that was PSI relies upon to the final version that DLA cited, all three of those have the exact same language and say that Class A welds, which these were, have a 0% acceptance factor for cracks open to the surface. Go ahead. The product was inspected, and it was accepted, and they were told to proceed with the full production, and not faulting or saying that there was any error, that further inspection perhaps found flaws in the product. But here there was this entire operation, and then the specifications were changed, and Mod 3 was accepted, and there was no irrational behavior on the part of the producer whose product, first the prototype and then larger scale, were accepted on inspection. Your Honor, the evidence that was in the record before the ASBCA was that when these parts were shipped, when they were received at the supply depot, they were kept in their original boxes. But let's accept that they were certain events that led this producer, this manufacturer, forward up to a certain commitment, at least. Whether or not it was correct in saying, you know, I'm going to argue with you rather than continue to produce product that you say is unacceptable. Yes, Your Honor. The record before the ASBCA showed that when the production parts were shipped in, they were kept in their original boxes. So they weren't actually opened, other than one item was opened to visibly glance at it and see if it was in fact, appeared to be what was supposed to be in the box. The rest were kept in their original boxes until they were shipped to Hill Air Force Base, and at that point they were inspected and the flaws were observed. So the flaws weren't detected immediately upon receipt of the boxes. But it's also important to note here that PSI was actually paid for its production parts. So to the extent it's claiming any loss, it would only be because it didn't get to produce the remainder of the parts that were actually behind schedule and that were due previously that had never shipped in. But it was actually paid for these defective parts that the government had to eventually scrap and couldn't even use. And again, PSI, as counsel acknowledged before the court this morning, at no time prior to the termination for default ever raised the issue of whether the correct welding standard was being applied or not. We don't think it makes any difference because as I noted, all versions of the standard had the same language saying you can't have any cracks open to the surface. When you say all versions of the standard, my understanding is we are talking about two standards. There was the original standard in the contract and then there was the election by the CEO to have a different welding standard that the skins would have to meet. So are you saying that both those standards have essentially the same requirements of no cracks? Yes, Your Honor. And if you'd like, I can walk through briefly the chronology. The contract itself contained a specification or a reference to a drawing, 160D411002. And the contract itself also contained a reference to a specification AF401. And the drawing that I referenced also referenced that AF401 drawing. If you go to the AF401 drawing, section 3.3.5 states that all the welds must be performed in accordance with a standard that was known as a military standard, MILW6858. If you go to that standard, that standard, the military standard was then replaced by a private sector standard, the AMS standard. And that is the standard that PSI cites, even though that standard was not referenced in the contract in any way. So PSI accepts that the evolution from the original military standard to the civilian private sector standard, even though not referenced in the contract, binds PSI. Then that AMS private sector standard eventually was amended and replaced with the AWS standard that was cited eventually in the termination for default by DLA. But all three of those versions of the standard contain the same language. And they're referenced in our brief in a table at pages 7 to 8. And they're in the appendix found at pages 705 to 706, 1273 to 1274, and 853 to 854. And all three of those different iterations of the same standard contain the language saying that class A welds can have a zero percent acceptance factor for cracks visible to the surface. And so regardless of which standard applies, even if you look at the standard that PSI claims DLA should have been referencing, that version itself says you can have zero percent acceptance for cracks visible to the surface. And the undisputed record here before the board is that every one of these 16 parts that were on hand at Hill Air Force Base that were inspected contained visible, you know, visibly apparent cracks to the surface. The issue that makes no difference, again, because that was additional testing that confirmed that there was cracking beneath the surface. But again, I guess they're arguing, or among their arguments, is not only the change in welding standard is some kind of significant, significant change, but so are all these testing requirements. And so those changes were so significant that it amounted to material breach by the government, thereby relieving them of moving forward. Your Honor, that appears to be what they're arguing now. As counsel acknowledged, that's not something that they ever pointed out to the Defense Logistics Agency at the time. That was not raised until in the midst of the summary judgment briefing before the ASBCA that this material breach concept was first raised. Are you saying that it's somehow they're precluded from raising that argument at the board? Well, Your Honor, if you go down the material breach path, to the extent it applies at all, and it applies, we acknowledge this court's case law recognizes that it can apply in certain limited circumstances. In those cases where it even can apply, where there actually has been a material breach by the government, the case law makes clear that the contractor has to make that known to the government at the time, and it has to elect essentially to alert the government there's been a material breach we are not going to perform. That is not something that occurred here. Counsel pointed to certain letters in the record, as the court noted through its questions, none of those actually say that PSI was alleging that the government was changing the standard or imposing, you know, obligations beyond the contract that would amount to a material breach. But the final communication from PSI before the termination for default was a letter that's found in appendix 1032 in which PSI finally responded to the second cure notice and said that basically it deemed modification three that imposed the requirement that they submit new test articles to be void and that they intended to go ahead and just send in production parts that were still owed. Well, that is not in any way a clear statement by PSI that it contended the government had committed a material breach that absolved it of having to comply with anything else under the contract. On the contrary, what it seems to have been saying was we're going to pick and choose which parts of the contract we're going to comply with. We're not going to comply with your requirement that we submit two new test articles, but we're going to go ahead and send in the other production parts that are behind schedule that we want to send in and get paid for. Well, there's nothing in any material breach case law that would support that notion that a contractor can pick and choose even if there has been a material breach. And, of course, we do not agree that there was any material breach here because, as I pointed out, even if one were to accept the conclusion that the agency was applying a different standard on welding, all the standards have the same language and so it can't have been a material breach to cite one version rather than another if they say the same thing. Unless you want to wrap up, I want to ask you a question about some statements in your brief, but I don't want to interrupt you from answering Judge Chen's question. Why did the contracting officer change from welding standard one to welding standard two if they say, as you put it, essentially the same thing? Your Honor, it wasn't that the contracting officer changed one welding standard to another. These are industry-wide standards. The original one was referenced in the contract and the industry-wide standards, the ultimate one that is published by SAE International, that body changed or amended the standard, replaced it with the newer version that, again, in this particular said the same thing. So it wasn't that the contracting officer was changing the specifications. It's that the updating them over time. So what happened between this letter of January 30th saying we'll provide all of the production items and then the termination for default a few months later? Your Honor, I don't believe the record... Well, within... Something must have happened. They weren't delivered. No, that's right. The parts were not delivered and internally the Defense Logistics Agency was analyzing the situation and prepared a termination memo, you know, recommending and then approving a termination for default, which was then issued. But no, PSI did not submit any additional parts after that point in time. In your brief, you have a few statements about that the government or that the board made factual findings and that they're factual determinations that we should review for substantial evidence. I don't understand really how that would operate in a summary judgment proceeding. Like, for example, on page 37 of your brief and page 38 and 39. But are you trying to say that there's no genuine issues of material fact? I really wasn't sure how to take this part of the brief. Yes, Your Honor. I apologize. That may have been inartfully worded. But it is correct that the board was addressing this on a summary judgment standard. And so what the board made findings, essentially, that there were no undisputed... Excuse me, that there were no disputed questions of material fact on the various points that it addressed. And so it's correct. There was no hearing here with fact finding by the board. It was factual determinations made based on the undisputed... Undisputed record and limited record on summary judgment. And then those were the undisputed facts. Correct. Okay, thank you. Your Honors, we would request that the court affirm the board's decisions. No questions? Okay, thank you. And Mr. Cox, you didn't request rebuttal time. Do you need one or two minutes? May I add just one point? May I? Okay. Thank you very much. I appreciate it. I just wanted to address the chart to which Mr. Parada referred in his brief, page 7 and 8. In the chart, it's a comparison of the three specs that we've been discussing. And as you know, it talks about visible criteria for test specimens, visible criteria for production parts, and then radiographic acceptance for test specimens. Notably absent from that chart is the fourth item, which is really the crux of our argument, radiographic acceptance criteria for production parts. And that is at the heart of the issue because the government's breach of They're saying we violated that, and that's why they were rejecting under the warranty clause. And I can direct the court to their letter where they specifically state that. That would be Appendix 10-14 and 10-15. And as the court will know in that letter, which attaches the September inspection report from Hill, I believe, it talks about D-17. I'm looking right now at Appendix 10-13. This was the Hill Air Force Base report that was attached to the government's breach of warranty letter. And in that letter, in the conclusion, it says, Accept to reject criteria established in AWS D-17-2 paragraph 4721 states all wells should be free of cracks and expulsion. Now that reference to D-17-2 can be found at Appendix 8-55. And again, this is the section we looked at, radiographic acceptance criteria of test wells free of cracks and expulsions. So that's the basis on which they reject it. So this chart that the government refers to about visible deformities or cracks in whether they're test or production parts is irrelevant because the rejection was based on the radiographic criteria. They used the wrong criteria. The correct criteria that we agreed to was 68-58. That was the spec. And that was not the highest standard, free from cracks and expulsions. It had certain measurements you had to take. Cracks and expulsions are okay as long as they don't meet a certain measurement level or are so big. And so that's really the heart of the issue here. They rejected it based on a higher standard, and they had no contractual or legal right to do that. Thank you. Okay, thank you. Thank you both. If case is taken under submission, that concludes our argued cases for this morning.